[No. H006578. Sixth Dist. Oct. 23, 1991.]

R. J. REYNOLDS CO., INC., Plaintiff and Appellant, v.
CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Defendant
and Respondent.

COUNSEL

H. R. Lloyd, Jr., James H. Anderson and Hoge, Fenton, Jones & Appel for Plaintiff and Appellant.

Frederick G. Hall, Clausen & Campbell and Black, Compean, Hall & Lenneman for Defendant and Respondent.

## OPINION

BAMATTRE-MANOUKIAN, J.—Appellant R. J. Reynolds Co., Inc. (Reynolds) contracted for services from Multi-Marketing, Inc. (MMI). MMI purchased liability insurance from Mission Insurance Co. and Mission National Insurance Co. (Mission), naming Reynolds as additional insured. While Mission was engaged in defending a claim against MMI, Reynolds and others, Mission became insolvent. Reynolds's own insurer, Aetna Life and Casualty Company (Aetna), took over the defense and negotiated and paid a settlement of the claim. The Aetna policy contained a retrospective premium endorsement. When the retrospective premium was calculated, in accordance with the terms of the Aetna policy, Reynolds' premium payment to Aetna included $200,000 of the incurred loss. Reynolds filed suit against the California Insurance Guarantee Association (CIGA), an association of member insurers formed to protect insureds from injury due to the insolvency of its members. Reynolds claims that CIGA had a duty to reimburse it the $200,000 it had paid to Aetna. The trial court granted summary judgment in favor of CIGA on the ground that the $200,000 retrospective premium payment was not a claim covered by CIGA, within the statutory definition of "covered claims." (Ins. Code, § 1063.1.) We agree with the trial court and affirm the judgment.

## BACKGROUND

Reynolds hired MMI to develop and manage a marketing program for the "1985 Camel GT Special Events" racing tour. The purpose of the program was to promote Reynolds's product to a specific market segment. As part of the promotional contract, MMI agreed to provide liability insurance naming Reynolds as additional insured for incidents arising on the tour. MMI also agreed to indemnify and defend Reynolds against all personal injury claims relating to the execution of its duties during the tour. MMI procured the required insurance from the Mission Insurance Companies.

Reynolds provided MMI a 1983 Nissan pickup truck, leased by Reynolds from Nissan Motor Company, U.S.A. (Nissan), for MMI's use during the tour. In addition to the insurance provided by MMI, Reynolds was insured under a policy of commercial automobile liability insurance issued by Aetna, and Nissan was insured under its own policy with Insurance Company of North America (INA).

On May 7, 1985, Tami Kay Hetke (Hetke) was injured while riding as a passenger in the Nissan truck, which was being driven by Matthew Alan

Boyd (Boyd), an employee of MMI. On October 16, 1985, Hetke filed a personal injury action against Boyd, MMI (and its companion corporation Field Marketing, Inc.), Reynolds and Nissan. Mission accepted Reynolds's tender of defense on July 8, 1986. However, on February 24, 1987, Mission was declared insolvent and the Insurance Commissioner of California was appointed to wind up Mission's affairs.

The liquidation orders triggered certain statutory obligations of CIGA pursuant to Insurance Code section 1063 et seq.[1] CIGA is an unincorporated association of insurers licensed to do business in California. Each liability insurer transacting business in this state is required to participate in the association. (§ 1063.) The statutory duty of CIGA is to provide insolvency insurance for each member by paying claims on policies with insolvent members. (*Interstate Fire & Casualty Ins. Co.* v. *California Ins. Guarantee Assn.* (1981) 125 Cal.App.3d 904, 908 [178 Cal.Rptr. 673].) CIGA is not authorized, however, to pay all claims, but only "covered claims," as defined by statute. (§ 1063.1, subd. (c).) Section 1063.1, subdivision (c), specifically enumerates those claims which are not "covered claims." Those include any claim which is "covered by any other insurance." (§ 1063.1, subd. (c)(9).)[2] On the basis that the Hetke claim was not a covered claim since both Reynolds and Nissan had "other insurance" available to them, CIGA declined to take over Mission's obligation to defend Reynolds and Nissan.

Aetna took up the defense of Hetke's claim and eventually negotiated a structured settlement agreement as Reynolds's and Nissan's liability insurer. The settlement agreement was executed December 28, 1987. It provided for an immediate lump sum payment to Hetke of $400,000 and the purchase of an annuity which would guarantee the payment of additional amounts monthly and at five-year intervals. Aetna paid the settlement, totalling $804,192.

Reynolds's insurance policy with Aetna included a "Retrospective Premium Endorsement" under which insurance premiums were rated retrospectively based on actual loss experience during the rating plan period. At the end of the period during which the Hetke claim was settled, the retrospective premium was calculated based in part on the total loss incurred in settlement of that claim. Under the terms of the policy, Reynolds was obliged to pay $200,000 of the incurred loss in its premium due to Aetna.

---

[1] All statutory references herein are to the Insurance Code.

[2] At the time of the claim in this case, the substance of subdivision (c)(9) was contained in subdivision (c)(7). In 1987, the Legislature amended section 1063.1 and these subdivisions were renumbered. (Stats. 1987, ch. 833, § 1, p. 2661.) We will be using the current numbering herein.

Because of CIGA's refusal to defend, and anticipating its obligation to Aetna for $200,000, Reynolds, joined by Aetna, filed a complaint for declaratory relief on October 19, 1987, against CIGA and others. In its complaint Reynolds alleged that CIGA had a duty to fully defend and indemnify Reynolds by virtue of succeeding to the indemnity obligations of the insolvent Mission. Reynolds alleged further that it was not insured for the first $200,000 of loss under its policy with Aetna and thus was entitled to a reimbursement of this amount from the CIGA fund.

On October 7, 1988, CIGA cross-complained against Aetna, Reynolds, and others, for declaratory relief. Eventually cross-motions for summary judgment were filed by CIGA and by Reynolds and Aetna and both motions were argued on August 28, 1989. In an order filed September 22, 1989, the trial court granted summary judgment in favor of CIGA on the ground that the $200,000 was not a "covered claim." It found that Reynolds's insurance policy with Aetna constituted "other insurance" as that term is used in section 1063.1, subdivision (c)(9) and that CIGA had no duty to reimburse Reynolds for amounts paid pursuant to the terms of the retrospective rating plan contained in that policy. The court found further that the $200,000 paid to Aetna by Reynolds under the retrospective premium provisions of its policy was "an obligation to an insurer" as that term is used in section 1063.1, subdivision (c)(4), and was therefore specifically excluded from the statutory definition of "covered claims."

Aetna and Reynolds appealed from the summary judgment order. Aetna subsequently dismissed its appeal.

## ISSUE

Reynolds does not contend that there are any triable factual issues. Its appeal presents only a legal question, whether $200,000 of the retrospective premium Reynolds paid Aetna is a claim covered by CIGA. After reviewing the statutory scheme, in particular section 1063.1, subdivision (c) which defines "covered claims," and the retrospective premium endorsement contained in Reynolds's insurance policy with Aetna, we conclude that the premium paid by Reynolds was not a covered claim.

CIGA was created in 1969 as a compulsory association of state-regulated insurance companies. (*Central National Ins. Co.* v. *California Ins. Guarantee Assn.* (1985) 165 Cal.App.3d 453, 458 [211 Cal.Rptr. 435]; §§ 1063.14; 1063, subd. (a).) Its purpose is "to provide insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies." (*Middleton* v. *Imperial Ins. Co.* (1983) 34

Cal.3d 134, 137 [193 Cal.Rptr. 144, 666 P.2d 1].) CIGA assesses its members when another member becomes insolvent, thereby establishing a fund from which insureds whose insurers become insolvent can obtain financial and legal assistance. (*Isaacson* v. *California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 784 [244 Cal.Rptr. 655, 750 P.2d 297].) Member insurers then recoup assessments paid to CIGA by means of a surcharge on premiums to their policy holders. (§ 1063.14, subd. (a).) In this way the insolvency of one insurer does not impact a small segment of insurance consumers, but is spread throughout the insurance consuming public, which in effect subsidizes CIGA's continued operation.

While CIGA's general purpose is to pay the obligations of an insolvent insurer, it is not itself an insurer and "does not 'stand in the shoes' of the insolvent insurer for all purposes." (*Biggs* v. *California Ins. Guarantee Assn.* (1981) 126 Cal.App.3d 641, 645 [179 Cal.Rptr. 16].) "CIGA is *not* in the 'business' of insurance . . . . CIGA issues no policies, collects no premiums, makes no profits, and assumes no contractual obligations to the insureds." (*Isaacson* v. *California Ins. Guarantee Assn., supra,* 44 Cal.3d at p. 787.) Rather it is authorized by statute to pay only "covered claims" of an insolvent insurer, those determined by the Legislature to be in keeping with the goal of providing protection for the insured public. (§ 1063.2, subd. (a).)

Section 1063.1, subdivision (c)(1) defines "covered claims" as "the obligations of an insolvent insurer . . . (i) imposed by law and arising out of an insurance policy of the insolvent insurer . . ."[3] The statute then specifically enumerates certain types of claims which are not "covered claims." Subdivision (c)(9) of section 1063.1 provides that " 'Covered claims' shall not include (i) any claim to the extent it is covered by any other insurance . . . available to the claimant or insured." Cases interpreting this language have established that where an insured has overlapping insurance policies and one insurer becomes insolvent, the other insurer, even if only a secondary or excess insurer, is responsible for paying the claim. In other words, CIGA is an insurer of last resort and does not assume responsibility for claims where there is any other insurance available. (*California Ins. Guarantee Assn.* v. *Liemsakul* (1987) 193 Cal.App.3d 433, 443 [238 Cal.Rptr. 346].) "The legislative intent was to create a protection for the public against insolvent insurers *when no secondary insurer is available.*" (*Central National Ins. Co.* v. *California Ins. Guarantee Assn., supra,* 165 Cal.App.3d at p. 458, italics added.) "The secondary insurer has received a premium for the risk and thus the secondary insurer, and not CIGA, should be responsible for the coverage

---

[3]In 1987 this language was amended, substituting "within the coverage of an insurance policy" for "arising out of an insurance policy." (Stats. 1987, ch. 833, § 1, p. 2661.)

of the loss." (*Ross* v. *Canadian Indemnity Ins. Co.* (1983) 142 Cal.App.3d 396, 404 [191 Cal.Rptr. 99].)

In *Ross* v. *Canadian Indemnity Ins. Co., supra,* 142 Cal.App.3d 396, plaintiff was injured while loading a truck. Signal Insurance Co., the primary insurer, became insolvent, and Canadian Indemnity, the excess insurer, took the position that CIGA was responsible for the defense of plaintiff's claim since CIGA succeeded to Signal's obligations and duties as primary insurer. CIGA argued that the claim was not a covered claim by virtue of section 1063.1, subdivision (c)(7) (now section 1063.1, subd. (c)(9)) because "other insurance" was available in the form of the Canadian Indemnity policy, albeit Canadian was only the excess insurer. Drawing upon the public policy considerations involved in the creation of CIGA as a protector of insurance consumers, the court decided in favor of CIGA, holding that "when a secondary insurer is available in the event of an insolvent primary insurer, the secondary insurer should be responsible" for coverage of the loss. (142 Cal.App.3d at p. 404.)

 In the case before us it is undisputed that Reynolds had other insurance available to it, in the form of the Aetna policy, when Mission, the primary insurer, became insolvent. Reynolds argues, however, that the language of subdivision (c)(9) provides a claim is excluded from CIGA coverage only "*to the extent it is covered* by any other insurance." (§ 1063.1, subd. (c)(9), italics added.) Reynolds contends that under its policy with Aetna, it was essentially not covered for the first $200,000 of any loss incurred. Had Mission not become insolvent, the argument runs, Reynolds would have been fully indemnified against any loss on the Hetke claim. Thus from Reynolds's point of view, Mission's insolvency and failure to discharge its obligations directly resulted in Reynolds having to pay $200,000 out of pocket. Thus Reynolds sees itself as an injured insured, one of the class CIGA is intended to protect.

CIGA argues that it has no duty to fully indemnify Reynolds simply because the Mission policy provided for indemnity. Indeed, as we have noted above, CIGA's duties are not co-extensive with the duties owed by the insolvent insurer under its policy. (*Biggs* v. *California Ins. Guarantee Assn., supra,* 126 Cal.App.3d at p. 645; *Saylin* v. *California Ins. Guarantee Assn.* (1986) 179 Cal.App.3d 256, 262 [224 Cal.Rptr. 493].) Thus, whether or not the Mission policy would have operated to fully indemnify Reynolds does not necessarily determine the extent of CIGA's obligation in this matter. Rather, CIGA's duty is first to determine whether a claim is a covered claim. (179 Cal.App.3d at p. 264.)

In regard to the $200,000 Reynolds paid to Aetna, CIGA argues that this was not a self-insured retention, but rather was part of the premium payment

Reynolds had agreed to pay Aetna under the terms of their contract. Seen in this light, Reynolds was fully insured under the Aetna policy, which represents "other insurance" and thus relieves CIGA of any responsibility for the Hetke claim.

Our review of the Aetna policy leads us to agree with CIGA on this point. **(3)** Retrospective rating is a premium plan whereby the insured pays an advance deposit and at the end of a specified period the final premium is calculated on the basis of actual loss experience. (5 Couch on Insurance (2d ed. 1984) § 30:17, pp. 563-569; *State Comp. Ins. Fund* v. *McConnell* (1956) 46 Cal.2d 330, 335-336 [294 P.2d 440].) **(1c)** The retrospective premium endorsement contained in Aetna's policy explains at the outset that Reynolds "*chose*" to have the cost of its insurance rated retrospectively. Under this plan Reynolds paid a "basic premium," which was less than the "standard premium" Aetna would have charged had Reynolds not elected retrospective rating. At the end of the rating period, the retrospective premium was calculated based upon all losses incurred during the period. Reynolds would pay a "converted loss" amount, representing sums paid by Aetna for losses incurred during the rating period up to a loss limitation of $200,000, multiplied by a percentage called the "loss conversion factor," which in this case was 1.1. Any loss in excess of $200,000 would be assessed an "excess loss premium." In sum, the retrospective premium consisted of three components: the basic premium, converted losses, and the excess loss premium.

Reynolds's characterization of this premium plan as one where the insured pays a set premium and then is uninsured for the first $200,000 of loss is misleading. Rather, it appears from the language of the policy that the $200,000, in the event of a loss during the rating period exceeding that amount, is but one component of the retrospective premium. Furthermore, Reynolds clearly elected to have the cost of its insurance rated retrospectively, thereby obtaining a substantial discount on the initial premium charged. The endorsement specifically provides: "Standard premium is the premium we would charge during the rating plan period for the insurance subject to retrospective rating if you had not chosen retrospective premium rating, . . . [¶] Basic premium is less than standard premium." Had Reynolds contracted with Aetna to pay a standard premium in exchange for more comprehensive coverage of claims arising during the policy period, CIGA would have no duty to reimburse Reynolds for that premium payment. We see no reason why a different result should obtain simply because Reynolds sought to minimize its cost of insurance by choosing the retrospective rating plan.

The manner in which the $200,000 was paid is consistent with our interpretation that it was a premium payment rather than an uninsured retention. Aetna settled the underlying claim on Reynolds's behalf and paid the entire amount of the settlement to Hetke. Had Reynolds been uninsured for the first $200,000, Reynolds would have been required to contribute this amount to the settlement even before Aetna's policy obligations arose. Instead, Aetna paid the whole claim and Reynolds paid nothing until its retrospective premium was due six months later. At that time the retrospective premium, calculated with reference to the loss experienced during the rating period, included $200,000 of the total $804,192 expended by Aetna on the Hetke claim.

In sum, we conclude that the retrospective premium endorsement was a matter of contractual agreement between Reynolds and its insurer Aetna. Reynolds's decision to pay its insurance premium retrospectively as a means of shifting a portion of the risk to itself does not alter the fact that it was covered by "other insurance" with a solvent insurer. Therefore subdivision (c)(9) applies to exclude the Hetke claim in its entirety from the class of "covered claims." (§ 1063.1, subd. (c)(9); Ross v. Canadian Indemnity Ins. Co., supra, 142 Cal.App.3d 396.)

We turn briefly to the second ground relied upon by the trial court in granting summary judgment, namely that the $200,000 was not a covered claim because it fell within subdivision (c)(4) of section 1063.1, which excludes from CIGA coverage "any obligations to insurers." CIGA contends that since the $200,000 was a premium payment, it was an obligation owed by Reynolds to an insurer and thus is excluded under subdivision (c)(4). Reynolds argues that this subdivision refers to obligations of the insolvent insurer to other insurers, such as subrogation claims. Both sides rely principally on the case of E. L. White, Inc. v. City of Huntington Beach (1982) 138 Cal.App.3d 366 [187 Cal.Rptr. 879], as did the trial court.

In that case, White and the city were codefendants in suits for personal injury and wrongful death. White's insurer, Royal Globe, paid one-half of the claims and then, as subrogee for White, sued the city for indemnity. city's primary insurer had a policy limit of only $6,000 and city's excess insurer became insolvent. In CIGA's action for declaratory relief, Royal Globe argued that CIGA must assume the role of the insolvent insurer and cover the subrogation claim for the excess over city's policy limit on the primary insurance. The court rejected this argument on the ground that Royal Globe was an insurer and its subrogation claim was an obligation of the insolvent insurer to another insurer under section 1063.1, subdivision (c)(4). Moreover, CIGA is specifically excluded from paying "any claim asserted by

an assignee or one claiming by right of subrogation . . . ." (§ 1063.1, subd. (c)(9).)

As Reynolds points out, it is neither an insurer nor a subrogee and thus its claim is not an obligation to an insurer, as in *E. L. White*. CIGA argues that the $200,000 is indirectly an obligation to an insurer, namely a premium payment which Reynolds has already paid and for which it seeks reimbursement. CIGA relies on the recent case of *Collins-Pine Co. v. Tubbs Cordage Co.* (1990) 221 Cal.App.3d 882 [271 Cal.Rptr. 20]; however, that case in essence involved a subrogation claim and therefore does not directly support CIGA's position, that a claim for reimbursement of a premium is an obligation to an insurer under section 1063.1, subdivision (c)(4).

We need not finally resolve the issue presented by these arguments regarding the interpretation of section 1063.1, subdivision (c)(4) since our conclusion based upon section 1063.1, subdivision (c)(9) stands on its own and is dispositive here. Reynolds had other insurance available to it and the terms of its premium payment plan under that policy triggered no duty of CIGA.[4]

### Disposition

The judgment in favor of the California Insurance Guarantee Association is affirmed.

Capaccioli, Acting P. J., and Premo, J., concurred.

---

[4]Reynolds directs our attention to legislation amending section 1063.1 in 1987 and 1989. In 1987, the Legislature added subdivision (c)(2)(vii) to exclude as a covered claim "any . . . insurance policy which contains a retrospective rating or other premium adjustment agreement . . . ." (Stats. 1987, ch. 833, § 1, p. 2661, No. 9 West's Cal. Legis. Service p. 2661 [No. 3 Deering's Adv. Legis. Service, p. 2489].) Then, in 1989, that language was deleted. (Stats. 1989, ch. 1258, § 1, No. 9 West's Cal. Legis. Service, p. 4318 [No. 6 Deering's Adv. Legis. Service, p. 4932].) Those amendments do not have direct bearing on our case, since they became effective only after the claim arose here. (See Stats. 1987, ch. 833, § 3, p. 2665.) Moreover, even if any legislative intent could be divined, as Reynolds suggests, from a subsequent addition, and then deletion, of the above language regarding retrospective rating, Reynolds has misconstrued the amendments, which refer not to policies of a solvent insurer but to policies of the insolvent insurer.