[No. H029043. Sixth Dist. Mar. 29, 2007.]

STONELIGHT TILE, INC., et al., Plaintiffs and Appellants, v. CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, Defendant and Respondent.

---

COUNSEL

William R. Delaney for Plaintiffs and Appellants.

Black Compean & Hall, Angela A. Zanin and Frederick G. Hall for Defendant and Respondent.

---

OPINION

**McADAMS, J.**—In this insurance coverage dispute, appellants Stonelight Tile, Inc. (Stonelight), and David G. Anson (Anson), Stonelight's controlling shareholder (hereafter jointly Plaintiffs), contend that the trial court erred when it granted respondent California Insurance Guarantee Association's (CIGA) motion for summary judgment. In its summary judgment motion, CIGA had argued that it was prohibited from contributing toward the payment of a judgment Plaintiffs had obtained against Diversified Recycling Services, Inc. (Diversified), in an action for damages due to repeated exposure to dust generated by Diversified's recycling operations, on the grounds that there was other insurance available to cover the judgment (Ins. Code,[1] § 1063.1, subd. (c)(9)).

Plaintiffs contend there was no other insurance available to them because CIGA's scope of coverage was different from that of the other insurers whose policies were triggered in this continuous loss case. Plaintiffs also contend that the continuous trigger of coverage that obligates the other insurers to pay the judgment in the underlying action in full, subject to a right of contribution, does not apply to Plaintiffs' claims for nuisance and trespass. We find no error and affirm the summary judgment.

FACTS

I. *Underlying Action*[2]

Stonelight had operated a tile manufacturing business in San Jose since 1947. At the time of the events giving rise to the underlying lawsuit, Anson was Stonelight's president and controlling shareholder. In 1987, Stonelight relocated to 1651 Pomona Avenue in San Jose. The following year, Diversified began recycling operations at an adjacent property at 1675 Pomona Avenue.

---

[1] All further statutory references are to the Insurance Code.

[2] The statement of facts regarding the underlying action is based on the statement of facts in this court's unpublished opinion on the appeal in the underlying action, *Stonelight Tile, Inc. v. Diversified Recycling Services, Inc.* (May 8, 2000, H018625).

### A. *The Dust Problem*

Diversified's recycling activities sent dust flying into the surrounding neighborhood. Some of the offending dust came from Diversified's tub grinder, a large machine that reduced recyclable wood products to splinters and fine particles. Tub grinding generated a significant amount of light brown dust that blew and settled onto neighboring properties, including Stonelight's property. The tub grinder occasionally spewed out metal fragments as well. Concern over Diversified's tub grinding operations prompted the City of San Jose (the City) to intervene in 1991. As a result of the City's legal action, a temporary restraining order issued, forcing Diversified to cease tub grinding as of July 23, 1991.

The termination of Diversified's tub grinding operations put an end to the light brown grinder dust, but did nothing to relieve the dark brown dust created by Diversified's other activities. Dust on materials accepted for recycling at the site was released into the air when the imported materials were unloaded, piled up, moved around, bulldozed, or loaded into trucks for transport offsite. A court-ordered watering and monitoring program proved ineffective in controlling the dust. At times, dust plumes rose 20 to 30 feet in the air. At other times, the blowing dust "looked like a blizzard." Sometimes, the dust layer was so heavy that footprints could be seen in it.

Anson and others complained about the dust to the Bay Area Air Quality Management District (Air Quality). Written reports documenting more than two dozen complaints over a three-year period were admitted into evidence at trial. In at least six instances, Air Quality inspectors confirmed that Diversified's operations generated dust that violated air quality standards.

Plaintiffs and their neighbors also complained to the City. City code inspectors concluded that Diversified's generation of dust created a nuisance that affected the neighbors and should be abated. The City's efforts to shut down Diversified's operations resulted in a stipulated permanent injunction requiring the defendant to obtain permits or cease operating by March 1, 1993. Despite the injunction and the lack of permits, the defendant did not cease operations on Pomona Avenue until June 1, 1994.

### B. *The Impact on Stonelight*

Stonelight made custom, high quality art tiles for an international market. Stonelight's product was vulnerable to contamination by wind-driven dust particles at each step of the manufacturing process, from initial clay preparation through drying, glazing and firing.

During clay preparation, clay was transported on open conveyor belts from a mixer to partially exposed storage silos, to a "pug mill," where water was

added. The clay was "chunked out" of the pug mill in sections and conveyed to a tile extruder. The extruded clay was cut into tiles of varying shapes and sizes. Decorative tiles might be pressed with a plate. Next, the tiles were dried, first in the open air and then in a large gas dryer. Stonelight's product was vulnerable to dust contamination whenever it was exposed during the manufacturing process.

Dried tiles were susceptible to dust intrusion during the glazing process. Special custom art tiles were glazed by hand in a partially exposed art room. Other tiles were exposed to dust contamination while traveling along the glazing line. Dust particles that settled on the tiles during glazing showed up as pock marks or pits on the tile.

The glaze itself was subject to contamination. Foreign substances dropping into the open glaze barrels could result in discoloration, a defect that would not be apparent until after firing. Contamination in the glaze barrels fouled the glaze nozzles, causing them to clog or spray the glaze unevenly, which affected the finish of the tile. Dust also created problems during firing, the last step in the production process.

Dust from Diversified's operations permeated the factory, covering tools and equipment, burning out motors, and creating physical problems for Stonelight's workers. As a result, Stonelight was compelled to clean its facility more often than usual. In addition, the company had to manufacture twice as many tiles to ensure sufficient quantities of undamaged tiles. More of Stonelight's finished product went into its "boneyard," where it was offered for sale at reduced prices. Stonelight lost customers because of manufacturing problems caused by the dust contamination. Gross sales declined dramatically between 1990 and 1994, and Stonelight suffered financial losses. Stonelight attempted to stage a recovery in June 1994, after Diversified ceased operations. However, that attempt was unsuccessful and Stonelight filed for bankruptcy protection in 1995.

### C. The Impact on Anson

Stonelight's failure was an enormous blow for Anson, both financially and emotionally. As Stonelight's manager, Anson was present at the Pomona Avenue property on a day-to-day basis. He even lived there for a time. While living there, Anson was directly and personally affected by the dust. Although he disavowed any claim of physical or psychological impairment, Anson testified that he went to the hospital, as did his workers who were experiencing physical problems as a result of the dust. Anson lost both his initial personal investment in the company and the accumulated salary he had deferred during the company's slide toward bankruptcy.

### D. Procedural History of Underlying Action

Stonelight, Anson, and Andrew Bonett (Bonett), the owner of a neighboring business that also claimed damages as a result of Diversified's recycling operations, sought compensation for their losses by suing Diversified. Their first amended complaint stated causes of action for public and private nuisance, negligence, battery, trespass to land, and intentional and negligent infliction of emotional distress.

Prior to the trial of the underlying action, Diversified brought a successful in limine motion that restricted the plaintiffs to proof of events within the applicable statutes of limitations. As a result, the plaintiffs were not allowed to offer: (1) evidence of nuisance or trespass damages or claims arising before July 11, 1991, or (2) evidence of personal injury tort claims or damages incurred prior to July 11, 1993.

In December 1997, a jury returned general verdicts in favor of all three plaintiffs, with special findings that Diversified had not acted with malice or oppression toward any plaintiff. The jury awarded $990,000 to Stonelight, $200,000 to Anson, and $6,624 to Bonett.

Diversified appealed, challenging the sufficiency of the evidence to support the verdicts. It also argued that Stonelight had failed to mitigate its damages and that Anson was not entitled to emotional distress damages. In May 2000, we affirmed the judgment in an unpublished opinion (*Stonelight Tile, Inc. v. Diversified Recycling Services, Inc., supra*, H018625).

## II. The Instant Coverage Dispute

### A. Pleadings

In October 2003, Plaintiffs filed a complaint pursuant to section 11580[3] to recover the amount of the judgments from the insurance companies that had provided liability coverage to Diversified between July 11, 1991, and June 1, 1994. The named defendants included three insurance companies (Transamerica Insurance Company, CIGNA Property and Casualty Company, and Continental Insurance Company; hereafter the Solvent Insurers) and CIGA. The operative pleading, the first amended complaint, alleges that the

---

[3] Insurance Code section 11580, otherwise known as the direct action statute, provides in relevant part that a liability insurance policy "shall not be issued or delivered to any person in this state unless it contains" a "provision that whenever judgment is secured against the insured . . . in an action based upon bodily injury, death, or property damage, then an action may be brought against the insurer on the policy and subject to its terms and limitations, by such judgment creditor to recover on the judgment." (§ 11580, subd. (b)(2).)

Solvent Insurers and Superior National Insurance Company (Superior National) provided liability coverage to Diversified during the period of time at issue in the underlying action, that after the issuance of its policy, Superior National became insolvent, and that CIGA administered the claims of the insolvent Superior National.

CIGA's demurrer to the first amended complaint based on the statute of limitations was overruled.

### B. Settlement with Solvent Insurers

Plaintiffs settled with the Solvent Insurers in December of 2004. Although the amounts and terms of the settlements are not reflected in the record, the parties have stipulated that the amount of each settlement "neither exhausted [each individual insurer's] policy limits nor fully satisfied the underlying judgment of $990,000 and $200,000."

### C. CIGA's Motion for Summary Judgment

In February 2005, CIGA filed a motion for summary judgment arguing that under section 1063.1, subdivision (c)(9), CIGA has no statutory duty to pay the judgment because Plaintiffs had not exhausted the other insurance that was available to them. It argued that Plaintiffs' claim was not a "covered claim" within the meaning of section 1063.1 because other insurance was available to Plaintiffs and that CIGA cannot violate statutory restrictions by paying claims that are not "covered claims." CIGA argued that each of the Solvent Insurers was liable for the entire amount of the judgment, because it was a continuous loss and, under the policy language and the rule stated in *Montrose Chemical Corp. v. Admiral Ins. Co.* (1995) 10 Cal.4th 645, 678 [42 Cal.Rptr.2d 324, 913 P.2d 878] (*Montrose*), each of the Solvent Insurers was responsible to pay the entire loss as long as some of the damage occurred during their policy periods. CIGA asserted that since the Solvent Insurers had policy limits that were sufficient to pay the entire judgment, Plaintiffs could not recover from CIGA. CIGA contended that Plaintiffs had settled "too cheaply" when they accepted amounts that were less than the Solvent Insurers' policy limits and did not cover the entire judgment and that Plaintiffs could not rely on CIGA to make up the difference.

The motion for summary judgment was based in part on stipulated facts, including the following insurance coverage information for Diversified:

| Insurance Carrier | Policy Period | Policy Number | Policy Limits[4] |
|---|---|---|---|
| Superior National | 1/11/91 to 1/11/92 | CBP 17589 | $1 million per occurrence $2 million aggregate |
| Transamerica | 1/11/92 to 1/11/93 | T7 31914744 | $1 million per occurrence $2 million aggregate |
| Transamerica | 1/11/93 to 1/11/94 | T7 31914744 | $1 million per occurrence $2 million aggregate |
| Continental | 1/11/94 to 3/29/94 | 93 CBP06154905-95 | $1 million per occurrence $2 million aggregate |
| CIGNA/Century | 3/29/94 to 3/29/95 | MFC D3177134 | $500,000 per occurrence $1 million aggregate |

Plaintiffs opposed the motion, arguing that there were triable issues whether the events that caused damages between July 11, 1991, and June 1, 1994, were separate, intermittent events that caused separate damages or whether the damages were progressive and continuous through each policy period. Plaintiffs argued that the trespasses of dust occurred daily and ended each night, when Diversified's operations shut down. They argued that different tiles were damaged each day. Plaintiffs argued it was undisputed that the damages caused by the tub grinder occurred only during Superior National's policy period, since the tub grinder ceased operation on July 23, 1991. Plaintiffs asserted that under the personal injury coverage provisions of the policy, which covered the trespass and nuisance causes of action, each insurer was only responsible for the offenses committed during its policy period.

In reply, CIGA argued that this was a continuous loss case and the fact that Diversified did not operate 24 hours per day, seven days per week does not create separate losses or events. CIGA argued that the underlying losses did not fall within the insurance policies' personal injury coverage and that even if they did, the trespass and nuisance offenses were continuous. CIGA also observed that the underlying judgment did not allocate to or determine whether any damages were due solely to tub grinding. It contended that Plaintiffs' damages were due to continuous or repeated exposure to Diversified's normal operations that generated dust and that the continuous and repeated exposure to substantially the same condition is a single occurrence under the policy.

The court granted CIGA's motion for summary judgment. The court concluded that "Plaintiffs suffered from continuously triggered injury" and that "[e]ach insurer could have been held liable for the entire loss." Accordingly, other insurance was available to Plaintiffs. Since other insurance was available, Plaintiffs could not recover from CIGA. Plaintiffs appeal.

---

[4] If we add together the insurance policy limits of the Solvent Insurers, the total insurance available from the Solvent Insurers was $3.5 million per occurrence and $7 million aggregate.

DISCUSSION

## I. *Contentions on Appeal*

Plaintiffs contend there was no other insurance available to them to cover losses incurred during Superior National's policy period because the Solvent Insurers did not have the same scope of coverage as Superior National. Plaintiffs' contention is based on the undisputed fact that tub grinding, which was responsible for creating some of the dust, only occurred during Superior National's policy period. Plaintiffs argue that the damages due to tub grinding, which created a light brown dust and metal projectiles, were different from the damages caused by Diversified's other operations and thus were not covered by the Solvent Insurers. Plaintiffs also argue there are triable issues whether the Solvent Insurers had the same scope of coverage as Superior National.

Plaintiffs contend the court erred in granting summary judgment because there is no other insurance for their trespass and nuisance claims because the continuous injury trigger of coverage, which provides that each policy triggered by a continuing or progressive loss claim has an independent obligation to respond to the loss in full, does not apply to their nuisance and trespass claims.

## II. *Standard of Review*

We review an order granting summary judgment de novo, considering all the evidence set forth in the moving and opposition papers, except that to which objections have been made and sustained. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 [100 Cal.Rptr.2d 352, 8 P.3d 1089].) In undertaking our independent review of the evidence submitted, we apply the same three-step analysis as the trial court. First, we identify the issues framed by the pleadings. Next, we determine whether the moving party has established facts justifying judgment in its favor. Finally, in most cases, if the moving party has carried its initial burden, we decide whether the opposing party has demonstrated the existence of a triable, material fact issue. (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 886–887 [41 Cal.Rptr.2d 740].)

A summary judgment motion "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) To be entitled to judgment as a matter of law, the moving party must show by admissible evidence that the "action has no merit or that there

is no defense" thereto. (*Id.*, § 437c, subd. (a).) A defendant moving for summary judgment meets this burden by presenting evidence demonstrating that one or more elements of the cause of action cannot be established or that there is a complete defense to the action. (*Id.*, § 437c, subd. (*o*)(2); *Aguilar, supra*, 25 Cal.4th at pp. 849–850, 853–854.) Once the defendant makes this showing, the burden shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action or defense. (Code Civ. Proc., § 437c, subd. (p)(2); see *Aguilar, supra*, 25 Cal.4th at p. 850.) Material facts are those that relate to the issues in the case as framed by the pleadings. (*Juge v. County of Sacramento* (1993) 12 Cal.App.4th 59, 67 [15 Cal.Rptr.2d 598].) In this case, defendant argued it was entitled to summary judgment because Plaintiffs could not establish one or more essential elements of each of their causes of action. It also requested summary adjudication in the alternative.

In ruling on the motion, we must consider the evidence and inferences reasonably drawn from the evidence in the light most favorable to the party opposing the motion. (*Aguilar, supra*, 25 Cal.4th at p. 843.) In performing our de novo review, we view the evidence in a light favorable to the losing party (Plaintiffs), liberally construing their evidentiary submission while strictly scrutinizing the moving party's (CIGA's) own showing and resolve any evidentiary doubts or ambiguities in the losing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617, 23 P.3d 1143].)

### III.  *Scope of Coverage*

#### A.  *History and Purpose of CIGA*

CIGA was created by the Legislature in 1969 to protect policyholders of insolvent insurers and third parties claiming under policies issued by insurers that become insolvent. (*California Ins. Guarantee Assn. v. Liemsakul* (1987) 193 Cal.App.3d 433, 438–439 [238 Cal.Rptr. 346] (*Liemsakul*); *Isaacson v. California Ins. Guarantee Assn.* (1988) 44 Cal.3d 775, 784 [244 Cal.Rptr. 655, 750 P.2d 297] (*Isaacson*).) "CIGA is a compulsory association requiring most state regulated insurance companies to be members, and provides insurance against loss arising from the failure of an insolvent insurer to discharge its obligations under its policies." (*Liemsakul, supra*, 193 Cal.App.3d at p. 437, fn. 2, citing *Central National Ins. Co. v. California Ins. Guarantee Assn.* (1985) 165 Cal.App.3d 453, 458 [211 Cal.Rptr. 435].) "CIGA assesses its members when another member becomes insolvent, thereby establishing a fund from which insureds whose insurers become insolvent can obtain financial and legal assistance. [Citation.] Member insurers then recoup assessments paid to CIGA by means of a surcharge on

premiums to their policy holders. (§ 1063.14, subd. (a).) In this way the insolvency of one insurer does not impact a small segment of insurance consumers, but is spread throughout the insurance consuming public, which in effect subsidizes CIGA's continued operation." (*R. J. Reynolds Co. v. California Ins. Guarantee Assn.* (1991) 235 Cal.App.3d 595, 600 [1 Cal.Rptr.2d 405] (*R. J. Reynolds*).) CIGA's role is similar to that of the Federal Deposit Insurance Corporation in banking and serves to enhance public confidence in the insurance industry. (*Liemsakul, supra*, at pp. 438–439.)

"While CIGA's general purpose is to pay the obligations of an insolvent insurer, it is not itself an insurer and 'does not "stand in the shoes" of the insolvent insurer for all purposes.' " (*R. J. Reynolds, supra*, 235 Cal.App.3d at p. 600.) "CIGA is not, and was not created to act as, an ordinary insurance company. [Citation.] It is a statutory entity that depends on the Guarantee Act for its existence and for a definition of the scope of its powers, duties, and protections." (*Isaacson, supra*, 44 Cal.3d 775, 786.) "CIGA issues no policies, collects no premiums, makes no profits, and assumes no contractual obligations to the insureds." (*Id.* at p. 787.) " 'CIGA's duties are not co-extensive with the duties owed by the insolvent insurer under its policy.' [Citation.] Instead, CIGA's authority and liability in discharging 'its statutorily circumscribed duties' are limited to paying the amount of 'covered claims.' " (*Industrial Indemnity Co. v. Workers' Comp. Appeals Bd.* (1997) 60 Cal.App.4th 548, 556–557 [70 Cal.Rptr.2d 295] (*Industrial Indemnity*).)

### B. *CIGA Pays "Covered Claims"*

■ "CIGA 'is authorized by statute to pay only "covered claims" of an insolvent insurer, those determined by the Legislature to be in keeping with the goal of providing protection for the insured public. [Citation.]' [Citation.] CIGA has the statutory authority to 'deny a noncovered claim.' (. . . § 1063.2, subd. (b).)" (*Industrial Indemnity, supra*, 60 Cal.App.4th 548, 557.) Thus, CIGA's first duty is to determine whether a claim placed before it is a "covered claim." Moreover, the scope of CIGA's rights and duties turns on the definition of "covered claim." (*Id.* at p. 557.)

Section 1063.1, subdivision (c)(1), defines "[c]overed claims" in relevant part as "the obligations of an insolvent insurer . . . imposed by law and within the coverage of an insurance policy of the insolvent insurer . . . which were unpaid by the insolvent insurer . . . for which the assets of the insolvent insurer are insufficient to discharge in full."

■ In section 1063.1, subdivision (c)(3) through (12), the statutory scheme lists 10 categories of claims or obligations that are not "covered

claims." Subdivision (c)(9) of section 1063.1, the subdivision at issue in this case, provides: " 'Covered claims' does not include (i) any claim to the extent it is covered by any other insurance of a class covered by this article available to the claimant or insured . . . ." Cases interpreting section 1063.1, subdivision (c)(9) "have established that where an insured has overlapping insurance polices and one insurer becomes insolvent, the other insurer, even if only a secondary or excess insurer, is responsible for paying the claim. In other words, CIGA is an insurer of last resort and does not assume responsibility for claims where there is any other insurance available." (*R. J. Reynolds, supra,* 235 Cal.App.3d at p. 600.) " 'The legislative intent was to create a protection for the public against insolvent insurers *when no secondary insurer is available.*' [Citation.] 'The secondary insurer has received a premium for the risk and thus the secondary insurer, and not CIGA, should be responsible for the coverage of the loss.' " (*Id.* at pp. 600–601.)

"CIGA's 'statutory duty' is to provide 'insolvency insurance to pay some (*but not all*) claims arising out of an insurance policy of an insolvent insurer.' [Citation.] Further, in creating CIGA, the Legislature 'chose to provide a limited form of protection for the public, not a fund for the protection of other insurance companies from the insolvencies of fellow members.' [Citations.] Accordingly, as noted by one appellate court, various subdivisions of . . . section 1063.1 express the 'statutory intent not to use CIGA funds to pay the insolvent's obligations to other insurers . . . .' " (*Industrial Indemnity, supra,* 60 Cal.App.4th 548, 558.)

In applying the pertinent statutes, we must decide whether Plaintiffs are "claimant[s]" asserting " 'covered claims' " that do not fall within any of the excluded categories. (*CD Investment Co. v. California Ins. Guarantee Assn.* (2000) 84 Cal.App.4th 1410, 1419 [101 Cal.Rptr.2d 806].) There is no dispute that Plaintiffs are "claimant[s]" for the purposes of section 1063.1, subdivision (h). " 'Claimant' means any insured making a first party claim or any person instituting a liability claim . . . ." (§ 1063.1, subd. (h).) Plaintiffs, who obtained a judgment in the underlying action, clearly meet the latter definition. There is also no dispute that the judgment in the underlying action falls within the definition of a covered claim in section 1063.1, subdivision (c)(1). The issue here is whether Plaintiffs' claims are excluded by section 1063.1, subdivision (c)(9) on the grounds that there was other insurance available to Plaintiffs.

### C. *Nature of the Loss: Continuous Exposure to Same Harmful Condition*

Plaintiffs argue there was no other insurance that precluded CIGA from participating in the case because Superior National's scope of coverage was

different from that of the Solvent Insurers because the damages that occurred during Superior National's policy period were different from the damages that occurred during the other policy periods.

We begin by reviewing the undisputed facts that bear on this issue. Although the record suggests Plaintiffs began experiencing problems due to the dust from Diversified's recycling operations prior to 1991, Plaintiffs' claims for property damage, nuisance and trespass were limited by the statute of limitations to damages occurring after July 11, 1991, and Anson's personal injury claims were limited to events occurring after July 11, 1993. Diversified ceased tub grinding activities on July 23, 1991,[5] and ceased operations altogether on June 1, 1994. Thus, tub grinding took place only during the first 13 days of the approximately two-year 11-month period at issue in the underlying action.

Plaintiffs contend Superior National's scope of coverage was different from that of the other insurers because it included damages from tub grinding and that the damages from tub grinding differed from the damages due to Diversified's other operations, which included the transfer of wood debris.[6] The tub grinder generated a fine, light brown wood dust and ejected metal projectiles. Diversified's transfer operations, which included the bulldozing, trampling and crunching of wood debris, generated a dark brown dust. The dust from the transfer operations was present both during and after the time the tub grinder was in operation.

The record contains copies of 36 inspection reports by Air Quality in 1991, 1992, 1993 and 1994. Eight of those reports involve conditions on dates before tub grinding stopped. The remaining 28 reports involve conditions on dates after tub grinding stopped. On July 15, 1991 (before tub grinding ceased), Anson complained to Air Quality that very large amounts of dust had floated onto his property that were not due to tub grinding. On July 26 and July 27, 1991 (a few days after tub grinding ceased), Anson complained that

---

[5] Plaintiffs argue there is a triable issue of fact regarding the dates tub grinding occurred, which precludes summary judgment. We find no merit to this contention, since it was undisputed that tub grinding ceased on July 23, 1991. Plaintiffs also argue there is a triable issue of fact whether Diversified paid the Solvent Insurers premiums for light brown wood dust coverage. Plaintiffs did not submit any argument or evidence related to this issue in the trial court and have therefore forfeited that claim on appeal. We note also that this claim is related to the issue of when tub grinding occurred, over which there is no dispute.

[6] In their brief on appeal, Plaintiffs refer to evidence of events that occurred in June 1991, that were outside the time period at issue in the underlying litigation. They also refer to depositions and exhibits from the trial in the underlying action that are not part of the record on appeal and do not appear to have been part of the evidentiary record in the coverage case. On appeal, we disregard documents and facts that were not presented to the trial court in the action below and that are not part of the record on appeal. (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 [227 Cal.Rptr. 491].)

Diversified was generating as much wood dust as ever even though it had removed the tub grinder. On July 31, 1991, Anson complained to Air Quality that even though the tub grinding had ceased, the dust problem still existed due to Diversified's transfer operations. Anson continued to complain to Air Quality for two years and eight months after the tub grinding ceased. Both Diversified's tub grinding and transfer operations created dust that permeated Plaintiffs' property. There was no evidence of damages to Plaintiffs' tile operations that were distinct because of the metal projectiles related to tub grinding. Nothing in the record suggests the damage to the tiles, the glaze, or the equipment was different from one type of dust than from the other. Although the dust may have been different in color and source, the offending substance was still dust.

We note also that all five of the insurance policies at issue in this case used the standard 1988 Insurance Services Offices (ISO) commercial general liability coverage form (ISO form. No. CG 00 01 11 88). Each of those policies defined an "occurrence" as "an accident, including continuous exposure or repeated exposure to substantially the same general harmful conditions." Given the facts set forth above, we conclude that Plaintiffs' exposure to dust from Diversified's operations met the policy definition of an occurrence because they involved a "continuous exposure or repeated exposure to substantially the same general harmful conditions." For these reasons, we are not persuaded that Superior National's scope of coverage was different from that of the other insurers based on the color and source of the dust or on the language of the insurance policies at issue.

### D.  Continuous Injury Trigger of Coverage

A key inquiry under an occurrence-based policy is what fact or event triggers an insurer's duty to defend and/or indemnify its insured. (Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 7:161, p. 7A-66.) The word "trigger" is not found in the insurance policy or defined in the Insurance Code. (Ibid.) It describes what must happen during the policy period to activate the insurer's duties to defend and indemnify. (Ibid., citing Montrose, supra, 10 Cal.4th 645, 655.) The trigger of coverage usually determines which insurance policy or policies may provide coverage. (Croskey et al., supra, ¶ 7:162, p. 7A-67.)

"[T]he proper resolution of a trigger of coverage issue in any given case may turn on whether the court is addressing underlying facts involving a single event resulting in immediate injury (e.g., an explosion causing instantaneous bodily injuries and destruction of property), a single event resulting in delayed or progressively deteriorating injury (e.g., a chemical spill), or a continuing event (referred to in [comprehensive general liability (CGL)]

policies as 'continuous or repeated exposure to conditions') resulting in single or multiple injuries (e.g., exposure to toxic wastes or asbestos over time)." (*Montrose, supra,* 10 Cal.4th at p. 666.) Based on the facts set forth above, we conclude the trial court did not err when it held that "Plaintiffs suffered from continuously triggered injury."

"Where . . . successive CGL policy periods are implicated, bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." (*Montrose, supra,* 10 Cal.4th at p. 689.) "The timing of the accident, event, or conditions *causing* the bodily injury or property damage, e.g., an insured's negligent act, is largely immaterial to establishing coverage; it can occur before or during the policy period. Neither is the date of discovery of the damage or injury controlling: it might or might not be contemporaneous with the causal event. It is only the *effect*—the occurrence of bodily injury or property damage during the policy period, resulting from a sudden accidental event or the 'continuous or repeated exposure to conditions'—that triggers potential liability coverage." (*Id.* at p. 675.)

■ Where damages continue throughout successive policy periods, as was the case here, all insurance policies in effect during those periods are triggered. Coverage is not limited to the policy in effect at the time of the precipitating event or condition and is not cut off once the injury or damage begins or becomes manifest. (*Montrose, supra,* 10 Cal.4th at pp. 677, fn. 17, 685–689.) Moreover, "once a policy is triggered, the policy obligates the insurer to pay 'all sums' which the insured shall become liable to pay as damages for bodily injury or property damage. The insurer is responsible for the full extent of the insured's liability . . . not just for the part of the [injury or] damage that occurred during the policy period." (*Armstrong World Industries, Inc. v. Aetna Casualty & Surety Co.* (1996) 45 Cal.App.4th 1, 105 [52 Cal.Rptr.2d 690] (*Armstrong*).) The continuous injury trigger has been applied in cases such as this where the policy obligates insurers to pay " 'those sums' " that the insured shall become legally obligated to pay. (*Century Indemnity Co. v. Hearrean* (2002) 98 Cal.App.4th 734, 738, 743 [120 Cal.Rptr.2d 66].) " '[W]here successive . . . policies have been purchased, bodily injury and property damage that is continuing or progressively deteriorating throughout more than one policy period is potentially covered by all policies in effect during those periods.' [Citation.] The successive insurers are not 'jointly and severally liable.' [Citation.] Rather, '[a]llocation of the cost of indemnification' among such insurers 'requires application of principles of contract law to the express terms and limitations of the various policies' . . . and, in their absence, 'equitable considerations' . . . ." (*Aerojet-General*

*Corp. v. Transport Indemnity Co.* (1997) 17 Cal.4th 38, 57, fn. 10 [70 Cal.Rptr.2d 118, 948 P.2d 909], citations omitted, citing *Montrose, supra,* at pp. 681, fn. 19, 686–687.)

■ When a continuous loss is covered by multiple policies, the insured may elect to seek indemnity under a single policy with adequate policy limits. If that policy covers " 'all sums' " for which the insured is liable, as most CGL policies do, that insurer may be held liable for the entire loss. (*Montrose, supra,* 10 Cal.4th at p. 665; *Armstrong, supra,* 45 Cal.App.4th at pp. 49–50.) The insurer called upon to pay the loss may seek contribution from the other insurers on the risk. (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra,* ¶ 7:177.7, p. 7A-72.3.)

However, a claim for contribution would not lie against CIGA, since such claims are statutorily barred under section 1063.1, subdivision (c)(5), which provides: " 'Covered claims' does not include any obligations to insurers, insurance pools, or underwriting associations, nor their claims for contribution, indemnity, or subrogation, equitable or otherwise, except as otherwise provided in this chapter." "In creating CIGA, . . . it was the Legislature's intent to protect the public, not to confer a benefit upon an insurance company." (*Liemsakul, supra,* 193 Cal.App.3d 433, 440–441.)

■ Applying these rules, each of the Solvent Insurers was responsible for the full amount of the loss, up to its policy limits. Plaintiffs entered into separate settlement agreements with each of the Solvent Insurers. The record does not disclose the amounts the Solvent Insurers paid to settle the case. Nor do we know the total amount of the settlements with the three Solvent Insurers or the amount of the insurance policy limits that remain after settlement. However, the parties' stipulated facts in support of the motion for summary judgment included stipulations that each of the settlements "neither exhausted [each Solvent Insurer's] policy limits nor fully satisfied the underlying judgment of $990,000 and $200,000." Since each of the Solvent Insurers was potentially liable for the full amount of its policy limits and that potential coverage was not exhausted in the settlements, we conclude there was other insurance available to Plaintiffs. Since there was other insurance available to cover this loss, it was not a "covered claim" within the meaning of the Guarantee Act. (§ 1063.1, subd. (c)(9).) We therefore conclude that the trial court did not err when it granted CIGA summary judgment on this basis.

Months before Plaintiffs settled with the Solvent Insurers, CIGA sent Plaintiffs a letter advising them that claims covered by other insurance are excluded and that they should exhaust the Solvent Insurers' policy limits before seeking payment from CIGA. Plaintiffs settled with the Solvent Insurers for less than policy limits with full knowledge of CIGA's position.

Plaintiffs "cannot bootstrap [their] claim against CIGA by releasing [their] right to recover under an available policy and claiming that as a result there is no other coverage." (*Parkwoods Community Assn. v. California Ins. Guarantee Assn.* (2006) 141 Cal.App.4th 1362, 1368 [46 Cal.Rptr.3d 921].) Plaintiffs chose to accept the risk of pursuing the claim against CIGA as part of their settlement with the Solvent Insurers. Their tactical choice cannot be used to increase the extent of CIGA's statutory liability. (*Ibid.*)

## IV. *CIGA's Liability for Trespass and Nuisance Claims*

Plaintiffs argue the court erred in granting summary judgment because there is no other insurance for their trespass and nuisance claims. They contend the continuous injury trigger of coverage, which provides that each policy triggered by a continuing or progressive loss claim has an independent obligation to respond to the loss in full, does not apply to their trespass and nuisance claims. Plaintiffs contend that because their trespass and nuisance claims are covered under the personal injury liability coverage, the policy was triggered at the time of the offense and not the loss or damages. They argue that CIGA is uniquely responsible for all trespass and nuisance offenses that occurred during Superior National's policy period and contend that because a different trigger of coverage applies, the Solvent Insurers cannot be held liable for nuisance and trespass damages occurring during Superior National's policy period. They also contend there are triable issues of fact regarding which offenses occurred during Superior National's policy period.

Plaintiffs are not precise about the language they use to describe these contentions. For this discussion, it is important to distinguish between *personal injury tort claims* that are payable under the bodily injury coverage of the CGL policy and claims (in this case nuisance and trespass claims) that may be payable under the *personal injury liability coverage* of the CGL policy. In their brief, Plaintiffs confuse the two concepts, using the phrases "personal injury . . . claims" and "personal injury . . . damages" to refer to claims that may be covered under the personal injury liability coverage of the CGL policy. For the purpose of our analysis, we shall assume all such references are to the personal injury liability coverage.

" 'Personal injury liability' is a term of art that covers certain enumerated offenses." (Croskey et al., Cal. Practice Guide: Insurance Litigation, *supra*, ¶ 7:2034.5, p. 7H-24.) "Unlike liability coverage for property damage or bodily injury, personal injury coverage is not based on an accidental occurrence." (*General Accident Ins. Co. v. West American Ins. Co.* (1996) 42 Cal.App.4th 95, 103 [49 Cal.Rptr.2d 603]' (*General Accident*).) Instead, personal injury coverage "is triggered by one of the offenses listed in the policy," not the injury or damages that a plaintiff suffers. (*Ibid.*; see *Martin*

*Marietta Corp. v. Insurance Co. of North America* (1995) 40 Cal.App.4th 1113, 1124–1125 [47 Cal.Rptr.2d 670].) The Superior National ISO form policy defines "bodily injury" in relevant part as "bodily injury, sickness or disease sustained by a person . . . ." The policy defines "personal injury" in relevant part as "injury, other than 'bodily injury,' arising out of one or more of the following offenses: [¶] . . . [¶] c. The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies . . . ."[7] Generally, California courts have construed "wrongful entry or eviction" as applying to tort claims arising out of the interference with an interest in real property, such as trespass, nuisance, and noninvasive interferences with the use and enjoyment of property. (*General Accident, supra*, at pp. 103–104.)

We are not persuaded that we need to reach Plaintiffs' issues relating to the personal injury liability coverage, since we have already concluded that there is other insurance available to cover the judgment under the bodily injury and property damage liability coverages. The other insurance is available regardless of whether a portion of the judgment may be attributable to the nuisance or trespass causes of action. Plaintiffs obtained a general verdict that does not allocate damages between Plaintiffs' negligence, nuisance, trespass, battery, and negligent or intentional infliction of emotional distress causes of action. By their nature, the damages Plaintiffs sought are awardable under a variety of theories and it is not clear from the verdict whether the amounts awarded were awarded under the negligence, nuisance, trespass or some other theory. Thus, we do not know which theory or theories the jury relied on in awarding Stonelight $990,000 and Anson $200,000.

Citing *Henderson v. Harnischfeger Corp.* (1974) 12 Cal.3d 663, 673 [117 Cal.Rptr. 1, 527 P.2d 353] and *Bresnahan v. Chrysler Corp.* (1998) 65 Cal.App.4th 1149, 1153 [76 Cal.Rptr.2d 804] (*Bresnahan*), Plaintiffs argue "when a case submitted on multiple causes of action results in a general verdict for the plaintiff, it is presumed that the plaintiff prevailed on each cause of the causes of action." Plaintiffs state the rule from these cases incorrectly. As the court explained in *Bresnahan*, " 'Where several counts or issues are tried, a general verdict will not be disturbed by an appellate court if a single one of such counts or issues is supported by substantial evidence and is unaffected by error, although another is also submitted to the jury without any evidence to support it and with instructions inviting a verdict upon it.' " (*Ibid.*) Thus, on review of the underlying judgment, the general verdict will be upheld if sufficient as to any one of the causes of action alleged.

---

[7] Other offenses enumerated in the policy that may trigger personal injury liability coverage include false arrest, detention, or imprisonment; malicious prosecution; and publications that are libelous or slanderous, that disparage goods, products or services, or that violate a person's right of privacy.

Application of this rule of appellate review does not mean the jury found for Plaintiffs on each of their causes of action below.

■ Moreover, with regard to Stonelight's claim, the court in *Mirpad, LLC v. California Ins. Guarantee Assn.* (2005) 132 Cal.App.4th 1058, 1070–1074 [34 Cal.Rptr.3d 136] (*Mirpad*), construing a personal injury liability coverage provision that is identical to the provision in the Superior National policy, held that coverage afforded under personal injury liability for wrongful eviction or wrongful entry only applies to claims by natural persons and is not available to a business organization like Stonelight. The *Mirpad* court interpreted the meaning of the word "person" under subdivision (c) of the personal liability coverage of the policy, which as noted above, defined personal injury as injury arising out of the " 'wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of . . . a room; . . . a dwelling; or . . . premises; . . . that *a person* occupies . . . .' " (*Id.* at p. 1070.) The court explained that the policy language must be read in the context of the entire policy. (*Id.* at pp. 1063, 1070.) The court stated that while a layperson would most likely think the word "person" refers to a natural person, in law the word can also mean a corporation or other legal entity. (*Id.* at p. 1074, fn. 14.) The court observed that the word "person" was consistently used throughout the policy to refer only to natural persons and that other types of legal entities, including corporations like Stonelight, were referred to in the policy as "organizations." The court concluded that because the policy used the words "person" and "organization" separately and distinctly, those words had to be accorded their separate and distinct meanings and held that the word "person" as used in the context of the wrongful eviction offense refers only to natural persons. (*Id.* at pp. 1070–1071.) Consequently, Stonelight's nuisance and trespass claims would not be covered under the personal injury liability portion of the policy.

With regard to Anson's claim, as we observed in the appeal of the underlying action, although the judgment in favor of Anson could be sustained on the nuisance or trespass theories, the parties seemed to assume that Anson's case went to the jury on his causes of action for negligent or intentional infliction of emotional distress. Anson's emotional distress claims were limited by the statute of limitations in the underlying action to damages occurring after July 11, 1993, a period that begins after the Superior National policy expired. (See also Code Civ. Proc., § 340, former subd. (3); 3 Witkin, Cal. Procedure (4th ed. 1996) Actions, § 530, p. 665.) Thus, even if we were to adopt Plaintiffs' reasoning with regard to the trigger of coverage for the nuisance and trespass claims, CIGA would not be responsible for Anson's emotional distress damages since they were limited to periods outside Superior National's coverage period.

Furthermore, personal injury liability for wrongful eviction or entry does not cover pollution damage to real property. (*Legarra v. Federated Mutual Ins. Co.* (1995) 35 Cal.App.4th 1472, 1483–1486 [42 Cal.Rptr.2d 101].)

For these reasons, we conclude that there is no merit to Plaintiffs' second contention that there is no other insurance for the trespass and nuisance claims because they are subject to a different trigger of coverage. In light of our conclusions, we shall not reach CIGA's contention that the continuous injury trigger of coverage applies to the personal injury liability coverage in this case, since the trespass and nuisance offenses were continuing in nature.

DISPOSITION

The judgment is affirmed.

Bamattre-Manoukian, Acting P. J., and Duffy, J., concurred.