**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CALIFORNIA INSURANCE GUARANTEE ASSOCIATION, *Plaintiff-Appellee/ Cross-Appellant*, v. ALEX M. AZAR II, Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH & HUMAN SERVICES; CENTER FOR MEDICARE AND MEDICAID SERVICES, *Defendants-Appellants/ Cross-Appellees.* | Nos. 17-56526 17-56528 D.C. No. 2:15-cv-01113-ODW-FFM OPINION |

Appeal from the United States District Court
for the Central District of California
Otis D. Wright II, District Judge, Presiding

Argued and Submitted May 16, 2019
Pasadena, California

Filed October 10, 2019

Before: Jacqueline H. Nguyen and John B. Owens, Circuit
Judges, and Michael M. Baylson,[*] District Judge.

Opinion by Judge Nguyen

## SUMMARY[**]

### Medicare / Preemption

The panel reversed the district court's judgment in favor
of Medicare in an action brought by the California Insurance
Guarantee Association ("CIGA"), seeking declaratory relief
after Medicare paid for and demanded reimbursement from
CIGA for medical expenses of certain individuals whose
workers' compensation benefits CIGA was administering.

CIGA provides funding when one of its member insurers
becomes insolvent and unable to pay its insureds' claims.
California state law prohibited CIGA from reimbursing state
and federal government agencies, including Medicare. The
district court concluded that federal law preempted
California law to the extent it prohibited CIGA from
reimbursing Medicare.

The panel held that as a "secondary payer," Medicare
was entitled to seek reimbursement from a beneficiary's
"primary payer," typically private insurance. The panel

---

[*] The Honorable Michael M. Baylson, United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It
has been prepared by court staff for the convenience of the reader.

further held that CIGA was not a primary plan, and specifically not a "workmen's compensation law or plan," 42 U.S.C. § 1395y(b)(2)(A)(ii), but instead CIGA was an insolvency insurer of last resort. The panel noted that insurance regulation was a field traditionally occupied by the states, and the panel presumed that the Medicare secondary payer provisions did not preempt state insurance laws unless Congress clearly manifested its intent to do so. The panel held that nothing in the Medicare statute or its implementing regulations suggested that Congress meant to interfere with state schemes to protect against insurer insolvencies. The panel reversed and remanded for further proceedings.

## COUNSEL

Daniel Tenny (argued) and Alisa B. Klein, Appellate Staff; Nicola T. Hanna, United States Attorney; Joseph H. Hunt, Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellants/Cross-Appellees.

Steven T. Whitmer (argued), Hugh S. Balsam, and Julie L. Young, Locke Lord LLP, Chicago, Illinois, for Plaintiff-Appellee/Cross-Appellant.

Benjamin F. Aiken, Orrick Herrington & Sutcliffe LLP, Washington, D.C.; John Blatt, National Conference of Insurance Guaranty Funds, Indianapolis, Indiana; Thomas Welsh, Orrick Herrington & Sutcliffe LLP, Sacramento, California; for Amicus Curiae National Conference of Insurance Guaranty Funds.

Xavier Becerra, Attorney General; Diane S. Shaw, Senior Assistant Attorney General; Lisa W. Chao, Supervising

Deputy Attorney General; Laura E. Robbins, Deputy Attorney General; Office of the Attorney General, Los Angeles, California; for Amicus Curiae Dave Jones, Insurance Commissioner of the State of California.

## OPINION

NGUYEN, Circuit Judge:

California requires insurers providing certain types of coverage to participate in the California Insurance Guarantee Association ("CIGA"), which provides funding when a member insurer becomes insolvent and unable to pay its insureds' claims. State law prohibits CIGA from reimbursing state and federal government agencies, including Medicare.

CIGA filed this declaratory action after Medicare paid for and demanded reimbursement from CIGA for medical expenses of certain individuals whose workers' compensation benefits CIGA was administering. The district court ruled in favor of Medicare, concluding that federal law preempted California law to the extent it prohibited CIGA from reimbursing Medicare. We reverse.

As a "secondary payer," Medicare is entitled to seek reimbursement from a beneficiary's "primary payer," typically private insurance. But CIGA is not a primary plan, and specifically not a "workmen's compensation law or plan." 42 U.S.C. § 1395y(b)(2)(A)(ii). Instead, it is an insolvency insurer of last resort. Insurance regulation is a field traditionally occupied by the states, and we must presume that the Medicare secondary payer provisions do not preempt state insurance laws unless Congress clearly manifested its intent to do so. Nothing in the Medicare

statute or its implementing regulations suggests that Congress meant to interfere with state schemes designed to protect against insurer insolvencies. We therefore remand for further proceedings.

## I.  Background

### A.  California's Guarantee Act

Beginning in the 1930s, individual states experimented with insurance guaranty funds to address the problem of insurer insolvencies. *See, e.g.*, *Carpenter v. Pac. Mut. Life Ins. Co. of Cal.*, 74 P.2d 761, 773 (Cal. 1937) (recognizing California's "comprehensive statutory scheme" regarding "the rehabilitation and liquidation of insurance companies"), *aff'd sub nom. Neblett v. Carpenter*, 305 U.S. 297 (1938); *see also* Michael P. Duncan, *The NAIC Model Property and Casualty Post-Assessment Guaranty Funds*, *in* American Bar Association, *Law and Practice of Insurance Company Insolvency* 460 (David M. Spector ed., 1986). At first, these funds concerned a single type of insurance, such as workers' compensation or taxicab liability. Duncan, *supra*, at 460. Following a spate of insolvencies by automobile insurers in the 1950s and 60s, Congress entertained various legislative proposals that would have created a nationwide scheme. *Id.* The first proposed bill was limited to automobile insurance, but a later proposal would have covered virtually all property and casualty insurance. *See* Linda M. Lasley et al., *Insurance Guaranty Funds: The New "Money Pit"?*, *in* Practicing Law Institute, *Insolvency and Solidity of Insurance Companies* 115–18 (1987).

Under the threat of federal regulation, the insurance industry in the late 1960s successfully lobbied individual states to enact guaranty funds, most based on the National Association of Insurance Commissioners' model act. *Id.*

at 116–19.  Congress dropped plans to legislate in this area, and today every state has some form of insurer insolvency scheme.  *Id.* at 119.  California's scheme, CIGA, was established in 1969 by the Guarantee Act, Cal. Ins. Code §§ 1063–1063.18, to insure against "loss arising from the failure of an insolvent insurer to discharge its obligations under its insurance policies."  *Isaacson v. CIGA*, 750 P.2d 297, 303 (Cal. 1988) (quoting *Biggs v. CIGA*, 179 Cal. Rptr. 16, 17 (Ct. App. 1981)).

An insurer's participation in CIGA is mandatory.  *See id.* (citing Cal. Ins. Code §§ 1063(a), 1063.1(a)).  When a member insurer becomes insolvent, the Guarantee Act authorizes CIGA to discharge certain of the defunct insurer's obligations referred to as "covered claims."  *Middleton v. Imperial Ins. Co.*, 666 P.2d 1, 3 (Cal. 1983).  CIGA funds the covered claims in part by collecting premiums from its member insurers in proportion to their market share.  *See id.* (citing Cal. Ins. Code §§ 1063.1(c), 1063.5).  Policyholders of the insolvent insurer who opt to proceed through CIGA "assign their claims against the estate of the insolvent insurer to CIGA."  *Id.* (citing Cal. Ins. Code § 1063.4).  CIGA then becomes a creditor in the insolvency proceeding and "share[s] in the assets of the insolvent company on final distribution."  *Id.* (citing Cal. Ins. Code § 1033).  After paying the covered claims, CIGA applies any reimbursements from the liquidator and unused member premiums "to reduce future premium charges."  Cal. Ins. Code § 1063.5(g).

As an insolvency insurer, CIGA "provides a limited form of protection for the public, and not for the protection of insurers."  *Interstate Fire & Cas. Ins. Co. v. CIGA*, 178 Cal. Rptr. 673, 677 (Ct. App. 1981).  CIGA "does not assume responsibility for claims where there is any other insurance

available," and is thus "an insurer of last resort." *R. J. Reynolds Co. v. CIGA*, 1 Cal. Rptr. 2d 405, 408 (Ct. App. 1991); *see* Cal. Ins. Code § 1063.1(c)(9)(A). In addition, CIGA's obligation is generally limited to "a claim by . . . the original claimant under the insurance policy in his or her own name." Cal. Ins. Code § 1063.1(c)(9)(B). CIGA does not cover "a claim asserted by an assignee or one claiming by right of subrogation," *id.*, or "any obligations to insurers, insurance pools, or underwriting associations, [or] their claims for contribution, indemnity, or subrogation," *id.* § 1063.1(c)(5).

In particular, CIGA is prohibited from paying "any obligations to a state or to the federal government." *Id.* § 1063.1(c)(4). If a person has "a claim or legal right of recovery under any governmental insurance or guaranty program that is also a covered claim," the person must "first exhaust his or her right under the program" before seeking a recovery from CIGA for any remaining unpaid portion of the claim. *Id.* § 1063.2(e).

## B. The Medicare Act and Secondary Payer Provisions

Medicare is a federally funded health insurance program that primarily benefits aged and disabled persons. *Palomar Med. Ctr. v. Sebelius*, 693 F.3d 1151, 1154–55 (9th Cir. 2012). Since its 1965 enactment, Medicare has paid claims covered by workers' compensation on a secondary basis. The Medicare Act provides that when "payment has been made, or can reasonably be expected to be made . . . under a workmen's compensation law or plan," any payment by Medicare for the medical service "shall be conditioned on reimbursement." Health Insurance for the Aged Act, Pub. L. No. 89-97, § 1862(b), 79 Stat. 286, 325 (1965) (codified at 42 U.S.C. § 1395y(b)(2)(A)(ii), (b)(2)(B)(i)).

Other than medical services covered by workers' compensation insurance, Medicare was originally the primary payer of its beneficiaries' medical costs, "even when such services were covered by other insurance." *Zinman v. Shalala*, 67 F.3d 841, 843 (9th Cir. 1995). During the 1980s, to cut the program's burgeoning costs, Congress amended the Medicare Act several times by expanding the situations in which Medicare was a secondary payer and facilitating Medicare's ability to seek reimbursement from primary payers.[1] *See Haro v. Sebelius*, 747 F.3d 1099, 1105 (9th Cir. 2014).

The statute now "forbid[s] Medicare payments when a primary plan . . . is reasonably expected to make payment for the same medical care." *Id.* (citing 42 U.S.C. § 1395y(b)(2)(A)–(B)). As relevant here, "the term 'primary plan' means . . . a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a

---

[1] *See* Omnibus Budget Reconciliation Act of 1980, Pub. L. No. 96-499, § 953, 94 Stat. 2599, 2647 (making Medicare the secondary payer for services covered under "under an automobile or liability insurance policy or plan . . . or under no fault insurance"); Deficit Reduction Act of 1984, Pub. L. No. 98-369, § 2344, 98 Stat. 494, 1095 (authorizing the United States to bring an action against a primary payer to recover payments); Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9319, 100 Stat. 1874, 2010–11 (making Medicare the secondary payer for certain disabled employees covered by large group health plans and authorizing a private cause of action against primary payers that fail to pay beneficiaries); Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6202, 103 Stat. 2106, 2225–32 (introducing "secondary payer" terminology and improving the mechanism for Medicare to determine when it is a secondary payer).

self-insured plan) or no fault insurance."**2**     42 U.S.C. § 1395y(b)(2)(A).

"[W]hen a primary insurer cannot reasonably be expected to pay promptly," the statute permits Medicare to make a conditional payment that later must be reimbursed. *Haro*, 747 F.3d at 1105 (citing 42 U.S.C. § 1395y(b)(2)(B)(i)–(ii)).   Medicare is entitled to recover this payment by filing a lawsuit against the primary plan. *Id.* (citing 42 U.S.C. § 1395y(b)(2)(B)(iii)).  If the primary plan has already disbursed the funds at issue, Medicare can recover them from any entity that currently possesses them, including the plan beneficiary or an attorney. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii); *Haro*, 747 F.3d at 1105.

## C.  Procedural History

CIGA administers the workers' compensation claims of several Medicare beneficiaries whose insurers became insolvent.   CIGA alerted Medicare's administrator, the Center for Medicare Services ("CMS"), that these individuals may be Medicare beneficiaries.  CMS, which contends that CIGA is a primary payer of medical expenses related to these individuals' work injuries, demanded that CIGA reimburse it for conditional payments that CMS had made on the Medicare beneficiaries' behalf.   When the parties could not resolve their dispute over CIGA's liability for the conditional payments, CIGA filed suit against CMS and related government defendants seeking declaratory and injunctive relief.

---

**2** In certain circumstances, a "primary plan" also includes "a group health plan or large group health plan."  42 U.S.C. § 1395y(b)(2)(A).

The district court determined that under the Medicare Act, CIGA is a primary plan for the workers' compensation claims it was administering and that CMS was entitled to reimbursement for the conditional payments it had made because any contrary provisions in the Guarantee Act were preempted. After the district court's resolution of subsidiary issues,[3] the parties stipulated to entry of judgment, from which both sides appeal.

## II.  Jurisdiction and Standard of Review

The district court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1291.[4] We review de novo the district court's ruling that CIGA is a primary payer liable for the conditional payments CMS made on behalf of Medicare beneficiaries. *See Allied*

---

[3] CIGA challenges the district court's ruling that the federal government as sovereign is immune from the Guarantee Act's claim-filing deadline, and CMS disputes the court's ruling that its billing practices were potentially unlawful. We need not reach either issue in light of our conclusion that CIGA is not a primary payer.

[4] We considered the parties' supplemental briefs and agree with the parties that the district court's judgment was final. Although the court did not resolve all issues necessary to determine whether CMS's billing practices were unlawful in three instances, CIGA abandoned its claims for declaratory and injunctive relief beyond that which the district court had already provided when it stipulated to entry of judgment on the court's extant orders. *See Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1366 n.3 (Fed. Cir. 2002) (applying Ninth Circuit law); *James v. Price Stern Sloan, Inc.*, 283 F.3d 1064, 1070 (9th Cir. 2002) ("We . . . hold that when a party that has suffered an adverse partial judgment subsequently dismisses remaining claims without prejudice with the approval of the district court, and the record reveals no evidence of intent to manipulate our appellate jurisdiction, the judgment entered after the district court grants the motion to dismiss is final and appealable under 28 U.S.C. § 1291.").

*Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1060 (9th Cir. 2018).

## III.  Discussion

### A.  Legal Principles Governing Preemption

Every preemption case is guided by two jurisprudential cornerstones.  First, "the purpose of Congress is the ultimate touchstone."  *Wyeth v. Levine*, 555 U.S. 555, 565 (2009).  Second, courts "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress," "particularly in those [cases] in which Congress has 'legislated . . . in a field which the States have traditionally occupied.'"  *Id.*  Insurance is such a field.  *See, e.g.*, *Galilea, LLC v. AGCS Marine Ins. Co.*, 879 F.3d 1052, 1058 (9th Cir. 2018); *see also* McCarran-Ferguson Act, Pub. L. No. 79-15, § 2(b), 59 Stat. 33, 34 (1945) ("No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . .") (codified at 15 U.S.C. § 1012(b)).[5]

Congressional intent "primarily is discerned from the language of the preemption statute and the statutory framework surrounding it."  *Omnipoint Commc'ns, Inc. v. City of Huntington Beach*, 738 F.3d 192, 193 (9th Cir. 2013)

---

[5] The district court concluded—and we assume without deciding—that the McCarran-Ferguson Act is inapplicable to the preemption question here because Medicare's secondary payer provisions specifically relate to insurance.  *See United States v. R.I. Insurers' Insolvency Fund* ("*RIIIF*"), 80 F.3d 616, 622 (1st Cir. 1996).

(quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 486 (1996)). In addition, courts consider "the structure and purpose of the statute as a whole," including "the way in which Congress intended the statute and its surrounding regulatory scheme to affect . . . the law and parties whose actions are affected by the statute." *Id.* (quoting *Lohr*, 518 U.S. at 486) (internal quotation mark omitted). Agency regulations that reasonably interpret the statute are accorded *Chevron* deference when determining the statute's preemptive effect. *See Reid v. Johnson & Johnson*, 780 F.3d 952, 964 (9th Cir. 2015) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44 (1984)).

When determining the meaning of a particular term, courts "look to the ordinary meaning." *Ass'n des Éleveurs de Canards et d'Oies du Quebec v. Becerra*, 870 F.3d 1140, 1147 (9th Cir. 2017), *cert. denied*, 139 S. Ct. 862 (2019). In both express and conflict preemption, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'" *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1039 (9th Cir. 2015) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)).

## B. Medicare's Secondary Payer Provisions do not Apply to CIGA

The district court ruled that the Medicare Act's secondary payer provisions applied to CIGA because they preempted the Guarantee Act both expressly and through an implied conflict. Both preemption analyses turned on the district court's conclusion that CIGA is a "primary plan," making it impossible for CIGA to comply with both

Medicare's demand for reimbursement and the Guarantee Act's prohibition of paying a government agency.[6]

Medicare regulations define "primary plan" to mean, "in the context in which Medicare is the secondary payer, a group health plan or large group health plan, *a workers' compensation law or plan*, an automobile or liability insurance policy or plan (including a self-insured plan), or no-fault insurance." 42 C.F.R. § 411.21 (emphasis added); *accord* 42 U.S.C. § 1395y(b)(2)(A). CIGA does not fall within the plain meaning of this definition because it is not a *workers' compensation* law or plan.

California categorizes insurance into various "classes," *see* Cal. Ins. Code § 100, such as workers' compensation insurance, *id.* § 109, automobile insurance, *id.* § 116, and liability insurance, *id.* § 108. While the Guarantee Act protects against defaults by insurers of these three classes,[7] *see CD Inv. Co. v. CIGA*, 101 Cal. Rptr. 2d 806, 810 (Ct. App. 2000) (citing Cal. Ins. Code § 1063(a)), CIGA itself is not one of them. Rather, it falls within the class of insolvency insurance. *See* Cal. Ins. Code § 119.5; *Isaacson*, 750 P.2d at 303.

---

[6] Though the Medicare Act's secondary payer provisions do not contain a preemption clause, the agency's regulations do: "Medicare benefits are secondary to benefits payable by a primary payer even if State law or the primary payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries." 42 C.F.R. § 411.32(a)(1).

[7] A similar statutory scheme governs life and health insurance. *See* Cal. Ins. Code §§ 1067–1067.19; *Penn. Health & Life Ins. Guar. Ass'n v. Superior Court*, 27 Cal. Rptr. 2d 507, 510 n.5 (Ct. App. 1994).

This distinction is reflected in California's two separate statutory schemes for workers' compensation and insurer insolvencies. *See* Cal. Labor Code §§ 3200–6149 (workers' compensation); Cal. Ins. Code §§ 1063–1063.18 (Guarantee Act); *see also* Richards D. Barger, *California Insurance Guarantee Association*, 45 State Bar J. 475, 476 (1971) (pointing out that "Article 14.2 creating [CIGA] is physically adjacent to those relevant sections relating to proceedings in cases of insolvencies and delinquencies"). It is also reflected in state court decisions distinguishing CIGA from a workers' compensation carrier.

CIGA is "an insurer of last resort" and thus "assumes responsibility for claims *only* when no secondary insurer is available." *Denny's Inc. v. Workers' Comp. Appeals Bd.*, 129 Cal. Rptr. 2d 53, 59 (Ct. App. 2003); *see also R. J. Reynolds Co. v. CIGA*, 1 Cal. Rptr. 2d 405, 408 (Ct. App. 1991) ("[W]here an insured has overlapping insurance policies and one insurer becomes insolvent, the other insurer, even if only a secondary or excess insurer, is responsible for paying the claim [rather than CIGA]."). *Denny's* distinguished CIGA's obligation to provide "insolvency insurance" from a workers' compensation insurer's obligation to provide "insurance against loss from liability imposed by law upon employers to compensate employees . . . for injury . . . arising out of and in the course of the employment." 129 Cal. Rptr. 2d at 56–58.

In *CIGA v. Workers' Compensation Appeals Board*, 39 Cal. Rptr. 3d 721 (Ct. App. 2006), the court confronted a dispute over CIGA's responsibility to reimburse another government agency—California's Employment Development Department ("EDD"). After providing temporary disability benefits to two individuals while their workers' compensation claims were pending, EDD filed lien

claims for reimbursement from the Workers' Compensation Appeals Board. *Id.* at 722–23 & 723 n.1. Because the workers' compensation carriers were insolvent, CIGA had been administering the workers' compensation claims. *Id.* at 723. EDD argued "that CIGA is required to provide workers' compensation benefits and, therefore, it is bound to reimburse EDD." *Id.* at 725. The court disagreed. While EDD was "[u]ndisputedly . . . entitled to reimbursement . . . when the employer's insurance company [was] solvent," EDD was not entitled to reimbursement from CIGA because "CIGA's obligations are not coextensive with those of solvent insurers." *Id.*

It makes little sense to interpret the statutory phrase "primary plan" to refer to a payer of last resort. The Medicare statute describes Medicare only as "secondary." Under agency regulations, the term "secondary" refers to benefits that "are payable only to the extent that payment has not been made and cannot reasonably be expected to be made under other coverage *that is primary to Medicare*." 42 C.F.R. § 411.21 (emphasis added). The qualifying phrase "that is primary to Medicare" implies the existence of coverage that is not primary to Medicare. Indeed, the agency has acknowledged one such example: "Medicare is [the] primary payer with respect to Medicaid" because Medicaid is "the payer of last resort." Final Rule: Medicare as Secondary Payer and Medicare Recovery Against Third Parties, 54 Fed. Reg. 41,716, 41,721 (Oct. 11, 1989).

Medicare regulations do not define "a workers' compensation law or plan." They do, however, provide illuminating examples. The term "includes the workers' compensation plans of the 50 States, the District of Columbia, American Samoa, Guam, Puerto Rico, and the Virgin Islands, as well as the systems provided under the

Federal Employees' Compensation Act and the Longshoremen's and Harbor Workers' Compensation Act." 42 C.F.R. § 411.40(a). While these examples are not meant to be exhaustive, CIGA, an insurer insolvency scheme, is dissimilar to all of them, suggesting that it is not a workers' compensation plan. *See In re W. States Wholesale Nat. Gas Antitr. Litig.*, 715 F.3d 716, 733 n.13 (9th Cir. 2013) ("*Noscitur a sociis* means that 'a word is known by the company it keeps,' and this canon is applied 'where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress.'" (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961))).

The agency first adopted this regulation in 1966. *See* Rules and Regulations: Exclusions, Recovery of Overpayment, and Liability of a Certifying Officer, 31 Fed. Reg. 13,534, 13536 (Oct. 20, 1966). Almost all states adopted insurance guaranty funds shortly thereafter. *See* Lasley et al., *supra*, at 119. More than half a century later, the agency has expanded its examples of a "workers compensation law or plan" to include the workers' compensation plans of American Samoa, Guam, and the Virgin Islands, yet the regulation continues to omit any mention of the state insurer solvency schemes. Given a state's "important and vital interest in the liquidation or reorganization of [insurance companies]," *Carpenter*, 74 P.2d at 774, the five decades of Congressional and agency inaction regarding insurer insolvency schemes further suggests that their omission from the Medicare statute and regulations was deliberate.

Other parts of the Medicare statute confirm that Congress did not intend to disrupt state laws governing insurer solvency. The Medicare Act contains a preemption provision that Medicare standards "shall supersede any State

law or regulation" regarding Medicare Advantage plans under Part C and prescription drug plans under Part D. *Do Sung Uhm v. Humana, Inc.*, 620 F.3d 1134, 1148 (9th Cir. 2010) (quoting 42 U.S.C. § 1395w-26(b)(3)); *see* 42 U.S.C. § 1395w-112(g). This preemption provision originally applied broadly to any state law that was inconsistent with federal requirements. *See* H.R. Rep. No. 108-391, at 556–57 (Conf. Rep.). In 2003, after "some confusion in recent court cases," *id.* at 557, Congress clarified that the preemption provision did not apply to "State laws relating to plan solvency." 42 U.S.C. § 1395w-26(b)(3).

Insurance is "[a] contract by which one party . . . undertakes to indemnify another party . . . against risk of loss, damage, or liability arising from the occurrence of some specified contingency." *Insurance*, *Black's Law Dictionary* (11th ed. 2019). As the district court correctly recognized, "in the case of a workers' compensation insurance plan," the "specified contingency . . . is the insured employee's work-related injury." And, as the court acknowledged, CIGA "is an arrangement through which other California insurers provide health benefits or medical care for [the insured's illness, injury, or loss] *when one of its member insurance companies become insolvent*" (emphasis added). *See also Olivier v. Merritt Dredging Co.*, 979 F.2d 827, 830 (11th Cir. 1992) (explaining that insurance guarantee funds "aid and benefit numerous citizens who have suffered losses *due to the insolvency of their insurers*" (emphasis added)). Thus, CIGA's obligations are triggered by an entirely different contingency—an insurer's insolvency—than are those of a workers' compensation plan. Because an insured employee's work-related injury is insufficient to trigger CIGA's obligations, CIGA is not a workers' compensation insurer.

By focusing on CIGA's obligation to pay for medical care, the district court improperly classified it as a workers' compensation plan based on the benefits it provides rather than the loss it protects against. *See Mason v. Am. Tobacco Co.*, 346 F.3d 36, 40 (2d Cir. 2003) (rejecting argument that corporations were "primary plans" just "because the corporate structure through which each conducts its business has the purpose and legal effect, in part, to assume legal liability for injury"). This mode of analysis would lead to strange results.

For example, legal malpractice insurance, which is not a "primary plan" under the Medicare Act, typically does not cover physical injuries that an attorney causes. It is distinct from personal liability insurance, which *is* a "primary plan." Yet if an attorney mishandles a physically injured client's case and the attorney's legal malpractice insurer pays the client money as damages for the client's unrecovered medical expenses, the legal malpractice insurance does, in some sense, "assume legal liability for injury." 42 C.F.R. § 411.21 (defining "plan").[8] But the legal malpractice insurance "does not have *primary* responsibility to pay for the claimant's medical injuries. That primary responsibility falls on the insurers who insure the parties involved in the incident." *Or. State Bar Prof'l Liab. Fund v. U.S. Dep't of Health & Human Servs.*, No. 3:10-cv-01392-HZ, 2012 WL 1071127, at *5 (D. Or. Mar. 29, 2012) (emphasis added); *cf. Thompson v. Goetzmann*, 337 F.3d 489, 499 (5th Cir. 2003) (rejecting "unreasonably broad interpretation" that tortfeasor who settled with beneficiary was self-insured and thus liable

---

[8] The parties dispute whether CIGA is a "plan" under this regulation. We need not decide the issue, however, because the Medicare Act covers only certain specified plans, and CIGA is not among them.

to Medicare because the statute "explicitly speaks in terms of *insurance plans* that provide *primary* medical coverage").[9] The legal malpractice insurer does not become obligated for medical expenses without the occurrence of some intervening event—the attorney's negligence—that has nothing to do with the medical injuries.

CMS cites to the First Circuit's decision in *RIIIF*, in which Rhode Island's analogue to CIGA argued that it is neither a "plan," "because an insurance insolvency-guarantor statute . . . is not an insurance 'policy,'" nor a primary plan, "because it is not the Medicare beneficiaries' private insurance carrier, but rather a non-profit governmental agency." 80 F.3d at 623. The First Circuit summarily rejected both arguments: "The [Rhode Island statute] itself provides that, upon a declaration of insolvency, the Fund is '*deemed* the insurer to the extent of the obligations [under the policy] on the covered claims,' subject solely to specified limitations on the amount of coverage. Thus, the Fund is deemed the private insurer, and hence a 'primary plan' . . . ." *Id.* (alteration in original) (citation omitted) (quoting R.I. Gen. Laws § 27-34-8(a)(2)).

We agree with *RIIIF* that an insurer insolvency fund's status as a statutorily created nonprofit government entity is irrelevant to whether it is a primary plan. If a state agency functions like an insurance company, then it is treated like one. *See, e.g.*, 42 C.F.R. § 411.40(a). Unlike the scheme at issue in *RIIIF*, however, "CIGA is not, and was not created to act as, an ordinary insurance company." *Isaacson*, 750 P.2d at 304. Because CIGA's authority to disperse

---

[9] The statute was amended at the end of 2003 to make tortfeasors liable. *See Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 289–90 (6th Cir. 2011).

funds to the insured is limited to "covered claims," *see* Cal. Ins. Code § 1063.2, it "does not 'stand in the shoes' of the insolvent insurer for all purposes." *Isaacson*, 750 P.2d at 304–05 (quoting *Biggs v. CIGA*, 179 Cal. Rptr. 16, 18 (Ct. App. 1981)). For example, unlike a private carrier, CIGA is not liable to an insured for tortiously mishandling a covered claim. *See id.* at 306.

Finally, even if CIGA could be construed as a workers' compensation law or plan, and hence a primary payer, a contrary interpretation is more than plausible. Well-established preemption principles favor upholding state law if it can plausibly coexist with the federal statute. *See Altria Grp.*, 555 U.S. at 77.

## IV.  Conclusion

Because CIGA is not a primary plan under the Medicare Act's secondary payer provisions, it has no obligation to reimburse CMS for conditional payments made on behalf of workers' compensation insureds. Therefore, we reverse and remand for further proceedings consistent with this opinion.

**REVERSED and REMANDED.**